UNITED STATES of America,
Plaintiff,

v.

PROCTER & GAMBLE COMPANY et al.,
Defendants.

Civ. A. No. 1196–52.

United States District Court
D. New Jersey.

As Amended June 11, 1959.

See also, 170 F.Supp. 689.

Chester A. Weidenburner, U. S. Atty.,
by Charles H. Hoens, Jr., Asst. U. S.

Atty., Newark, N. J., Margaret Brass, Antitrust Division, Dept. of Justice, Washington, D. C., for plaintiff.

O'Mara, Schumann, Davis & Lynch, Jersey City, N. J., Cahill, Gordon, Reindel & Ohl, by Mathias Correa, New York City, for Colgate-Palmolive Co.

Bailey & Schenck, Newark, N. J., Arnold, Fortas & Porter, by Abe Fortas, Washington, D. C., for Lever Brothers Co.

Toner, Crowley, Woelper & Vanderbilt, Newark, N. J., Royall, Koegel, Harris & Caskey, by Kenneth C. Royall, New York City, Dinsmore, Shohl, Dinsmore & Todd, by Joseph Dinsmore, Cincinnati, Ohio, Taft, Stettinius & Hollister, by Charles Sawyer, Cincinnati, Ohio, for Procter & Gamble Co.

Davies, Richberg, Tydings, Landa & Duff, by Shelby Fitze, Washington, D. C., McCarter, English & Studer, Newark, N. J., for Association of American Soap & Glycerine Producers, Inc.

HARTSHORNE, District Judge.

■ The various defendants herein have filed a series of motions and interrogatory proceedings directed to the use, or prohibition against the use, by all parties, of the transcript of the Grand Jury proceedings herein. The defendants claim reliance upon the principles, some of them of novel import, recently enunciated by our highest court in this very case, United States v. Procter & Gamble Co., 1958, 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077. It should be noted that these Grand Jury proceedings, in which the testimony of some thirty persons was taken over the course of many months, all terminated more than six years ago, on November 25, 1952, without an indictment, and but a short time before the complaint in this civil antitrust suit was filed by the Government on December 11, 1952.

The first of such defense motions to be filed asks this Court to impound from all concerned not only this entire Grand Jury transcript now in the hands of the Government, but all data obtained by the Government therefrom. If this motion were granted, then, barring later application to this Court on cause shown, the Government might be compelled to divest itself of all data and knowledge obtained in its lengthy discovery proceedings herein during the past six years, including literally hundreds of thousands of defendants' documents, if indeed the complaint itself could still stand, since all are doubtless based on the information obtained through the Grand Jury proceedings. The second defense motion is one asking this Court to make available to the defendants certain testimony before the Grand Jury, for special cause shown, including the testimony, on the one hand, of a deceased witness, and, on the other hand, of an important Government Defense official. The third of such proceedings is in the form of a long series of interrogatories which the defendants ask the Government to answer, in order to ascertain with respect to such Grand Jury proceedings whether and, if so, when, the Government decided to pursue only civil antitrust proceedings against the present defendants. This determination apparently occurred at some time, since the present civil complaint was filed, shortly after the Grand Jury proceedings terminated, but no indictment was ever sought from the Grand Jury, United States v. Procter & Gamble Co., supra, 356 U.S. at page 687, note 2, 78 S.Ct. at page 989. The defendants' theory here is that, if any Grand Jury proceedings were taken subsequent to the Government's determination not to seek an indictment, such subsequent proceedings were a subversion of such Grand Jury proceedings, under the above decision of the Supreme Court, which would entitle the defendants to receive the transcript of the Grand Jury proceedings, to that extent. The final motion by the defendants, upon the basis of similar interrogatories, and assuming that such a subversion as the above has occurred, asks that the transcript of such Grand Jury proceedings and all data obtained therefrom by the Government, apparently including the complaint itself, be sup-

pressed from any use by the Government.

To consider this final motion now would be premature, since such motion is sought only if it has been previously established that there has been a subversion of the Grand Jury process, as stated in *Procter & Gamble*, by the use of the Grand Jury process solely for civil purposes. Moreover, the first of such motions—that to impound the Grand Jury transcript from all parties—is one as to which the Supreme Court itself, as differentiated from a distinguished member of the Court, has not yet laid down the controlling principle. Since the second of the above motions concerns only a relatively small portion of the Grand Jury transcript, while the third proceeding—that on the defense interrogatories—covers not only this portion, but the entire Grand Jury proceedings, in which all parties are actually interested, including this important question as to a possible subversion of the Grand Jury process, this Court will deal now with this third motion.

The issue between the parties on this motion falls within small compass. The Government admitted, both in its brief and on the argument, that if, *at the outset* of the Grand Jury investigation, the Government intended to bring a civil case only, then under *Procter & Gamble* there would have been such an abuse of the Grand Jury process that wholesale discovery of the Grand Jury transcript to the defendants would be warranted. The parties are at issue only on the point as to whether the same result follows, if the Government's determination to proceed with a civil case only is made, not before the Grand Jury is summoned, but thereafter, during the course of its proceedings, and thus might constitute a subversion of so much of the Grand Jury proceedings as occurs after the Government has determined not to proceed criminally at all.

As the Government well says, the decision of the United States Supreme Court in *Procter & Gamble, supra,* "is not only the law of the land; it is the law of this case." Accordingly, we turn to the statement of our highest court as to the law of the land and of this case in the above regard.

In *Procter & Gamble, supra,* in referring to the opinion of another branch of this Court, which it reverses, our highest court says:

"It [the lower court] also seemed to have been influenced by the fact that the prosecution was using criminal procedures to elicit evidence in a civil case. If the prosecution were using that device, it would be flouting the policy of the law. * * *

"We cannot condemn the Government for any such practice in this case. There is no finding that the grand jury proceeding was used as a short cut to goals otherwise barred or more difficult to reach. It is true that no indictment was returned in the present case. But that is no reflection on the integrity of the prosecution. For all we know, the trails that looked fresh at the start faded along the way. What seemed at the beginning to be a case with a criminal cast apparently took on a different character as the events and transactions, were disclosed. The fact that a criminal case failed does not mean that the evidence obtained could not be used in a civil case. It is only when the criminal procedure is subverted that 'good cause' for *wholesale* discovery and production of a grand jury transcript would be warranted." [Emphasis by the Court] 356 U.S. at pages 683–684, 78 S.Ct. at page 987.

Clearly, our highest court has thus held that to use "criminal procedures to elicit evidence in a civil case * * * would be flouting the policy of the law" and that, under such circumstances, "when the criminal procedure is subverted that 'good cause' for *wholesale* discovery and production of a grand jury transcript would be warranted."

The critical question thus is, when this case first became only "a civil case."

From that time on, our highest court has said that using the Grand Jury to elicit evidence in that case would flout the law, would subvert criminal procedure, would require that any advantage thus obtained improperly by the Government be wiped out, by giving the opposing party the use of so much of the Grand Jury transcript as was thus obtained by a criminal procedure in a purely civil case. It would seem that neither the language of our highest court, nor its basic reasoning, can reasonably be read otherwise. It would be as unfair to permit the Government, after having finally decided not to proceed criminally, to continue to use the unique, and solely criminal, functions of a Grand Jury for a solely civil purpose, as it would be to permit the Government to do this same thing when, from the beginning, it had that same, solely civil, intention. The subversion of this ancient criminal procedure, for the time that it exists, is the same in the one case as in the other.

The sole reason for bringing this motion at this time is because our highest court, in the absence of evidence such as is sought by the present interrogatories, was compelled to say that at the time the case was laid before it "there is no finding that the grand jury proceeding was used as a short cut to goals otherwise barred or more difficult to reach." Of course, as the Court says, where "the trails that looked fresh at the start" for a criminal prosecution "faded along the way," so that "what seemed at the beginning to be a case with a criminal cast apparently took on a different character as the events and transactions were disclosed," even so, that does not mean that the evidence obtained could not be used "in a civil case," if, when that evidence was obtained, it had not already been decided to abandon the criminal proceedings. If such criminal proceedings were still in contemplation, the criminal procedure by the Grand Jury was being properly used, and there was no subversion. If, on the contrary, for instance, before the last witness had testified before the Grand Jury, the Government had determined authoritatively not to proceed by indictment, then as to that last witness, the law had been flouted, and since the Grand Jury process had been subverted, the testimony of that witness should be discovered and produced to the other side.

Furthermore, if the Government's argument were correct, that the existence at the inception of the Grand Jury proceeding of an intent to seek an indictment rendered these entire proceedings valid, despite the fact that almost immediately thereafter the Government abandoned any such criminal proceedings, it is easy to see to what abuses it would give rise. Indeed, the situation then would approach that in the recent past when, before the above decision in *Procter & Gamble,* the Government admittedly used Grand Jury proceedings freely, at its discretion, for civil purposes only.[1]

The Government, in answer to the above, argues that the mere decision by the Government to pursue a civil remedy only does not finally prevent the Grand Jury proceedings from being used for indictment purposes, since the Grand Jury itself might decide to seek an indictment, despite such decision of the Government, i. e., to become a "runaway" Grand Jury. Of course, if any such unusual situation as this did occur, then, upon its proof, the Grand Jury would continue to be one pursuing a criminal investigation, and there would be no subversion. But, in the absence of such proof, it would follow that the determination of the Government not to obtain an indictment would be controlling and decisive, particularly in an antitrust case, the complexity of which virtually requires the careful, long-continued control of the Grand Jury proceed-

---

1. See the testimony, May 12, 1955, before the Special Antitrust Subcommittee of the Judiciary Committee of the House of Representatives, of Honorable Stanley N. Barnes, then Assistant Attorney General of the United States in charge of the Antitrust Division, Bureau of National Affairs, Inc. Report, p. 350.

ings by the Government itself, in order to make out a case.

Nor is the Government correct in its argument that the dissenting opinion in Procter & Gamble, 356 U.S. at page 689, 78 S.Ct. at page 990, indicates that *Procter & Gamble* holds that the only subversion of the Grand Jury process occurs when the Grand Jury investigation had been "instituted solely in aid of a civil suit." In the first place, the majority opinion is not so limited. Indeed, the language of the Court that "For all we know, the trails that looked fresh at the start faded along the way," 356 U.S. at page 684, 78 S.Ct. at page 987, would seem to infer the contrary possibility. In addition, the basis of the dissent is that it is "unable to see why the case where a grand jury investigation has aborted, and the Government thereafter uses the transcript solely in aid of its civil case should be treated differently" from the situation where the Grand Jury proceedings were from the beginning instituted solely in aid of a civil suit. This abortion, alluded to by the dissent, apparently connotes a proper conception —of a Grand Jury proceeding in the first place, i. e., for the purpose of an indictment, either alone or conjoined with civil proceedings—with the outcome of such proceedings thereafter unexpectedly showing that no such criminal proceedings will lie, i. e., an abortion. The refusal of the Court to hold that such a situation would not prevent the use of the Grand Jury transcript for civil purposes, in nowise indicates that the Court would permit the use, for civil purposes only, of evidence taken before the Grand Jury, after the Government had finally decided not to use the Grand Jury process for any criminally investigative purpose at all, but for civil purposes only. These situations are widely different. In the first, the Grand Jury procedure—a criminal procedure—is, in addition to a possible civil purpose, in fact used for an actual, intended, criminal purpose, and, as *Procter & Gamble*

holds, is therefore lawful, and there has been no subversion. In the second, the testimony before the Grand Jury, after the finding of an indictment has been abandoned, is the use of criminal procedure for a solely civil purpose. Such taking of the evidence is therefore improper, and there has been a subversion of the Grand Jury process to that extent. Thus, in order to prevent the Government from obtaining an unfair advantage of the defendants by its unlawful act of discovery, and yet at the same time not to render impossible the effectuation of the policy of the antitrust acts, the evidence thus improperly obtained must be discovered also to the defendants.

As for the Government's objection that a presumption of regularity in the conduct of governmental affairs should be deemed to exist, it should be noted, first, that previous to the decision in *Procter & Gamble,* the Department of Justice had regularly considered it the proper thing to do, when the occasion arose, to use the Grand Jury to make even a solely civil case under the antitrust laws.[2] Thus the question here is not whether the Government did the regular thing in fact, but whether this regular thing which it did was in fact lawful, in the light of the rule for the first time laid down by our highest court in *Procter & Gamble.* Not only so, but this presumption or regularity, being a mere presumption, is effective, like other presumptions of fact, only in the absence of evidence to the contrary. Here what defendants seek is to ascertain if there is evidence to the contrary. They cannot be deprived of this right by that presumption. Finally, there is cause for the defendants' seeking to ascertain this fact from the only source which knows that fact—the Department of Justice. We must here bear in mind, first, that initially both criminal and civil investigation and prosecution as to the present defendants were authorized,[3] but that ultimately no indictment was ever pre-

---

2. See note 1, supra.

3. See note 4, infra.

sented to the Grand Jury by the Government, as previously noted. In the second place, we must bear in mind that, within less than three weeks after the Grand Jury was discharged, the carefully drawn and voluminous civil complaint herein was filed. True, that does not necessarily prove that the decision to abandon an indictment was not made until after the Grand Jury was discharged, but the contrary may also have been the fact, and it is this "finding" of fact which our highest court has determined to be crucial, in order to do justice between the parties.

■ The Government also contends that the information sought by the defendants here is privileged and not the subject of discovery. However, when the Court at the argument called the Government's attention to the fact that it had not made a "formal claim of privilege [which] must be lodged by the Attorney General after actual personal consideration by that officer," United States v. Reynolds, 1952, 345 U.S. 1, 8, 73 S.Ct. 528, 532, 97 L.Ed. 727, the Government indicated it had not decided whether or not to lodge any such formal claim of privilege. Without going into details, it may therefore be helpful to note that, where the Executive Department of the Government has voluntarily sought the aid of the Judicial Department of the Government to enforce the law of the land, as here, and the United States Supreme Court has declared that the law of the land requires a certain "finding", in order to do justice between the parties in that judicial proceeding, it would not seem that the Executive Department could rely on a mere "housekeeping" privilege of its own, to refuse to abide by the law of the land and give evidence as to such "finding." Nor is this "finding" one as to the Department's "mental processes" in reaching a decision involving judgment or discretion. The finding is actually as to the decision reached, not as to the reasons for such decision. It also is as to a decision, not as it affects the internal workings of the Department, but as it results in the

prosecution of third parties in the courts, as determined by that very decision, and by the very official who presumably made that decision. In addition, it would seem inconceivable that the national security and the safety of the nation generally was involved, as alluded to in *Reynolds*, so as to prevent the Department of Justice from stating what this determination was, and when it was made, as to proceeding criminally, civilly, or both, as to these defendants, as already held necessary by our highest court in this very case, in order to do justice to all concerned.

Nor would any authoritative decision by the Department of Justice to proceed thereafter solely civilly in this antitrust case constitute the "work product" of the Department, generally privileged from discovery, under Hickman v. Taylor, 1947, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451. In the first place, a determination to indict or not to indict is far different from the reasons bearing on a determination as to what evidence to use or not to use on the trial of a certain indictment, the latter being a common example of work product. In the next place, any such determination not to indict is the specific "finding," which the United States Supreme Court has declared in this very case to be necessary to do justice between the parties. This holding by our highest court would thus constitute the good cause to discover this determination of the Department of Justice, even if indeed it were a "work product," as *Hickman* specifically holds.

Our highest court has thus made clear the principles that (a) as long as the Government has a criminal investigation in mind, whether this be its sole purpose or a purpose conjoined with one to seek a civil remedy, the Government's use of this criminal procedure remedy by Grand Jury proceedings is valid. But (b), on the contrary, if the Government has no such criminal proceedings in mind, but intends to seek a civil remedy solely, then any use of the Grand Jury remedy thereafter constitutes, as to such later action, a "flouting of the policy of the

law" and a subversion of criminal procedure, regardless of when this solely civil purpose authoritatively arises.

In the light of these principles, we turn to the facts in this cause. On April 9, 1951, the then Attorney General wrote Mr. Walker Smith, Antitrust Division, Department of Justice:[4]

> "You are hereby specially retained and appointed under the authority of the Department of Justice in connection with the investigation and prosecution of alleged violations of the Federal antitrust laws * * * and other Federal criminal statutes, by certain persons, firms, corporations, associations * * * engaged in the production * * * and sale of soap and other detergents * * *. In this connection you are hereby expressly directed to conduct * * * any and all kinds of legal proceedings, civil and criminal, or both, including Grand Jury proceedings * * * which district attorneys are authorized by law to conduct."

It will be noted, first, that this subordinate official of the Antitrust Division of the Department of Justice is appointed in connection not only with the "in-vestigation" but with the "prosecution" of the present case. It will be noted also that he is not merely authorized to conduct this investigation and prosecution, but is "directed" to conduct both such investigation and prosecution. In other words, he is directed to make investigation along all lines, using the general proceedings "which district attorneys are authorized by law to conduct," including specifically Grand Jury proceedings. Only after he has carried out this direction to him to use investigatory procedures, both criminal and civil, can Mr. Smith have possibly carried out these directions to him to make such investigation. Only after he has completed such investigation, can he possibly be in a position to have a determination made by someone in the Department of Justice as to how the "prosecution of alleged violations of the Federal antitrust laws" shall occur, whether by the criminal proceedings set forth in such statutes, by the civil remedies set forth therein, or by both. Furthermore, the affidavit of Walker Smith as to exactly what the situation was so far as he is concerned, executed March 21, 1953, states "that he was authorized and instructed by his superiors in the Department of Justice to carry on a complete investigation [as

4. The full letter reads as follows:

"April 9, 1951

"Mr. Walker Smith,
"Antitrust Division
"Department of Justice
"Dear Mr. Smith:

"As an attorney and counselor at law you are hereby specially retained and appointed under the authority of the Department of Justice in connection with the investigation and prosecution of alleged violations of the federal antitrust laws, Sherman Act (c. 647, 26 Stat. 209, U.S.C., Title 15, Sections 1–7, 15 [note]) as amended by the Act of August 17, 1937 (c. 690, 50 Stat. 693, U.S.C., Title 15, Section I), Clayton Act (38 Stat. 730, U.S.C., Title 15, Sections 12–27) as amended, and other federal criminal statutes, by certain persons, firms, corporations, associations and their members, and others, engaged or having been engaged in the production, processing, distribution, purchase and/or sale of soap, other detergents or materials used in their manufacture, or in related activities.

"In this connection you are hereby expressly directed to conduct in the United States District Court for the District of New Jersey, and in any other judicial district where the jurisdiction thereof lies, any and all kinds of legal proceedings, civil and criminal, or both, including grand jury proceedings, proceedings before committing magistrates, proceedings by information, and removal proceedings, which district attorneys are authorized by law to conduct.

"You are to serve without compensation other than that you are now receiving as an attorney in the Department.

"Please execute the required oath of office and return one copy thereof to the Department of Justice.

"Respectfully,
"J. H. McGrath
Attorney General
"By the Attorney General:
"/s/ Peyton Ford
"Deputy Attorney General."

above] * * * so that a determination could be made as to whether there were violations of * * * the Federal antitrust laws and as to what action should be taken in performance of the duties of the Attorney General and of the Department of Justice to enforce those laws through criminal or civil proceedings, or both; that the investigation and all proceedings incident thereto, including the Grand Jury proceedings in the District of New Jersey * * * were carried on pursuant to and within those instructions * * *."

Further details as to the procedure in the Department of Justice in such situations is set forth by the defendants as coming from the Assistant Attorney General in charge of the Antitrust Division in 1955. This was agreed to by the Government as setting forth generally the situation in this very case in fact as follows:

> "In the first instance a recommendation is made by the attorney in charge of the particular investigation. If he is in the field, his recommendation is then reviewed by his field office chief. It is then reviewed by the appropriate litigation section chief in Washington. The section chief's decision is reviewed by the first or second assistant to the Assistant Attorney General and by the Assistant Attorney General. Review at the various levels is effected not only by oral conferences, but also by written memoranda of facts detailing the evidence against each proposed defendant." [5]

Therefrom it appears that the attorney in charge of the particular investigation, here Mr. Walker Smith, does not have the power to determine what action the Government shall take, whether civil or criminal, or both, as the result of his investigation into a possible violation of the antitrust laws. All this attorney in charge can do is first to investigate, and thereafter to recommend to his field office

chief what course this prosecution should take. This review of his field office chief is then in turn reviewed by the litigation section chief in Washington, D. C. The latter's review in turn is reviewed by the first or second assistant to the Assistant Attorney General, and thereupon by the Assistant Attorney General. Whether it is the Assistant Attorney General, or the Attorney General himself, who determines whether the prosecution is or is not finally to be criminal, would seem unimportant. Whichever it is, the finding should be sought first from him.

It is the lack of proof in this cause as to what such authoritative determination by the Government was, and when it was made, that made our highest court in *Procter & Gamble* say that "there is no finding that the grand jury proceeding was used as a short cut to goals otherwise barred or more difficult to reach." But that Court has also held that the use of "criminal procedures to elicit evidence in a civil case * * * would be flouting the policy of the law," and a subversion of criminal procedure, and that this would call for "wholesale discovery" by clear inference of all of the Grand Jury proceedings which were taken after the Government had determined not to proceed criminally. Thus it now becomes necessary, in order to do justice, to determine when the Government did finally determine to proceed against the present defendants solely by the present civil complaint, as it obviously did at some time.

It follows that since no subordinate, such as the attorney in charge of the particular investigation, here Walker Smith, could normally do more than make a mere recommendation in that regard to his superiors, the point of inquiry as to when this determination was made should be first directed to the authority who could make such a controlling determination here, presumably the Assistant or Deputy Attorney General, or the Attorney General himself. But this

---

5. Report, Attorney General's National Committee to Study Antitrust Laws, p. 350 (1955).

fact, crucial to the rights of the parties, as stated by our highest court, must be ascertained in order to do justice.

In order to ascertain the above "finding that the Grand Jury proceeding was used as a short cut to goals otherwise barred or more difficult to reach," or that it was not, the defendants have filed voluminous interrogatories directed to the officials of the Department of Justice, from top to bottom. Since the crucial determination, as to when the Department determined to proceed civilly only, was presumably made only at the highest levels, clearly all such interrogatories at the lower levels are presently unnecessary, harassing and improper. It is only if discovery at these highest levels is fruitless, that discovery at lower levels may become appropriate. In order to lessen the difficulties of the parties and to expedite the result, the Court will confer with counsel for all concerned as to the most appropriate procedure, in order to ascertain the above "finding," deemed crucial by the United States Supreme Court in this very case.